IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DORTHAAN WATTS o/b/o D.W., | : | CIVIL CASE |
| Plaintiff, | : | |
| v. | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | NO. 12-4116 |

## MEMORANDUM RE: PLAINTIFF'S REQUEST FOR REVIEW

Baylson, J.                                                                                                                                                    May 31, 2013

### I.     Introduction

Plaintiff D.W., a minor, seeks judicial review of a decision by the Commissioner of Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-83(f). After careful consideration of all the relevant facts and circumstances, and for the reasons below, D.W.'s Request for Review of the November 23, 2010 decision of the Administrative Law Judge ("ALJ") is DENIED, and her Complaint is DISMISSED with prejudice.

### II.     Background

#### A.     Procedural History

On October 9, 2008,[1] (Tr. at 176) D.W., through her grandmother and guardian, filed an application for SSI, claiming that D.W. suffers from a disability beginning on January 1, 1994, due to the severe impairments of mental retardation, depressive mood disorder, disruptive disorder, a reading disorder, a learning disorder, and asthma. (Br. at 5.) The application was denied on February 24, 2009. D.W. then filed a timely request for a hearing on April 17, 2009.

---

[1] The Court notes that the ALJ's decision mistakenly states that the date of the Application was September 17, 2008. (Tr. at 16.)

On August 26, 2010, a hearing was held before ALJ Anne W. Chain at which D.W. requested a postponement to give her time to seek representation. ALJ Chain granted the postponement and rescheduled the hearing for October 26, 2010. At the October 26, 2010 hearing, D.W. was represented by an attorney and testified on her own behalf. (Tr. at 36.) D.W.'s grandmother also testified at the hearing. (Id. at 37.) On November 23, 2010, ALJ Chain denied D.W.'s application for benefits. (Id. at 13.) D.W. subsequently sought review of the decision before the Appeals Counsel. (Id. at 12.) On June 1, 2012, the Appeals Counsel denied the request for review. (Id. at 2.)

### B. The ALJ's Decision

The ALJ rejected Plaintiff's claim that she suffers from mental retardation, finding instead that Plaintiff suffers from the severe impairment of borderline intellectual functioning. (Tr. at 19, 21-22.) The ALJ did, however, agree with Plaintiff that she suffers from the severe impairments of asthma, depressive mood disorder, disruptive disorder, a reading disorder, and a learning disorder. Nevertheless, the ALJ found that Plaintiff's impairments neither meet any of the listings in the Social Security Administration's (the "SSA") Listing of Impairments found in Appendix 1 to subpart P of 20 C.F.R. chapter. III, part 404 ("Appendix 1"), nor are the medical or functional equivalent of any of the listings in Appendix 1.

### C. D.W.'s Grounds for Appeal

#### 1. D.W.'s Initial Argument

Initially, D.W. raised only one issue on appeal, that the ALJ misapplied the listing for mental retardation in section 112.05 of Appendix 1. Section 112.05 states that mental retardation is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning." Section 112.05 also contains a list of six disjunctive criteria – referred to by letters "A" through "F," e.g., section 112.05A – satisfaction of any of which means that the

claimant meets "[t]he required level of severity for" the mental retardation listing (the "Severity Criteria"). D.W. argued that the ALJ misapplied section 112.05D, which states that "the level of severity for [mental retardation] is met when . . . [the claimant has a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function."

Specifically, D.W. argued that:

1. She satisfies the requirements of section 112.05D because:

    a. The record contains a valid full scale IQ score of 69, and

    b. The ALJ found that she suffers from the severe impairments of asthma, depressive mood disorder, disruptive disorder, a reading disorder, and a learning disorder; and

2. The ALJ erred by:

    a. Improperly disregarding her full scale IQ score of 69, and

    b. Using an incorrect definition of "substantial limitation of function," which caused the ALJ to improperly disregard her severe impairments when applying section 112.05D.

## 2. The Court's Request for Additional Briefing

The Court's review of the ALJ's decision revealed that the ALJ had, in fact, applied section 112.05 incorrectly. The ALJ's recitation of section 112.05 is incorrect, because the ALJ:

1. Listed only three of section 112.05's six Severity Criteria[2];

2. Stated that the claimant must meet at least two of the Severity Criteria, while section 112.05 is clear that the criteria are disjunctive; and

3. Stated the incorrect definition for "significant limitation of function" in sections 112.05D and 112.05F.

    a. The ALJ defined "significant limitation of function" as requiring that the claimant meet two of the impairment-

---

[2] The ALJ listed four criteria, but two of them are the same.

3

related functional limitations for organic mental disorders, found in section 112.02B2.[3] (Tr. at 21-22.)

b. However, according to Appendix 1, "significant limitations of function" under sections 112.05D and 112.05F are caused by impairments that are severe "as defined in [20 C.F.R.] § 416.924(c)." App'x 1 § 112.00A, para. 8.

---

[3] D.W. incorrectly argued that the ALJ defined "significant limitations of function" according to the "general severity requirements" for Appendix 1, (Br. at 7, 10) which are found in 20 C.F.R. § 416.926a(b)(1). Id. § 416.925(b)(2)(ii). The "general severity requirements" are determined by reference to six functional "domains": "[a]cquiring and using information"; "[a]ttending and completing tasks"; "[i]nteracting and relating with others"; "[m]oving about and manipulating objects"; "[c]aring for yourself"; and "[h]ealth and physical well-being." Id. § 416.926a(b)(1).

The Court also notes that the ALJ did not specifically reference section 112.02 in her decision. However, the text of the ALJ's definition of "significant limitation of function" is lifted almost entirely from section 112.02B2, and where it does not follow 112.02B2 verbatim, it is materially similar:

| **Text of ALJ's Decision** | **Text of Section 112.02B2** |
|---|---|
| marked impairment in age-appropriate cognitive/communicative function; | a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or |
| marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or | b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or |
| marked impairment in age-appropriate personal functioning, documented by history and medical findings; or | c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or |
| deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. | d. Marked difficulties in maintaining concentration, persistence, or pace. |

The Commissioner's brief did not address the fact that the ALJ had improperly applied section 112.05. Instead, the Commissioner argued that D.W. cannot satisfy the two requirements for mental retardation set forth in the introductory paragraph of section 112.05 – "significantly subaverage general intellectual functioning" and "deficits in adaptive functioning" – which are independent of the six Severity Criteria in 112.05A-F. (Resp. at 8.)

However, the Court's review of the ALJ's decision revealed no indication that it is based on D.W.'s failure to satisfy the requirements of section 112.05's introductory paragraph. At the same time, the ALJ's findings of fact – which D.W. had not challenged – are apparently sufficient to conclude that D.W. cannot meet any of the six Severity Criteria as a matter of law. Accordingly, on April 30, 2012, the Court requested additional briefing from the parties to address whether the ALJ's decision may be upheld on legal grounds it does not address.

### 3. The Parties' Responses

D.W. responded on May 13, 2013, without explicitly addressing the issue of whether the Court may uphold the ALJ's decision on legal grounds it does not address. Instead, D.W. argues that the ALJ's findings of fact are sufficient to establish that she meets two of the six Severity Criteria, sections 112.05D and 112.05F2,[4] and that she meets the requirements in section 112.05's introductory paragraph.

The Commissioner responded on May 14, 2013, arguing that pursuant to Shinseki v. Sanders, 556 U.S. 396 (2009), the Court should uphold the ALJ's decision because her incorrect application of section 112.05 amounts to harmless error. According to the Commissioner, the ALJ made no error in her findings of fact, and those findings are sufficient to establish that D.W. meets neither the requirements in section 112.05's introductory paragraph, nor any of the six Severity Criteria.

---

[4] She concedes to not satisfying any of the other Severity Criteria. (Pl.'s Suppl. at 4.)

### III. Legal Standard

**A. Jurisdiction**

The Social Security Act provides for judicial review by this Court of any "final decision of the Commissioner of Social Security" in a disability proceeding. 42 U.S.C. §§ 405(g), 1383(c)(3). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id. § 405(g). When an Appeals Council denies a petitioner's request for review, the ALJ's decision operates as the Commissioner's final decision for the purposes of judicial review. Matthews, 239 F.3d at 592.

**B. Standard of Review**

On judicial review of the Commissioner's decision, the Commissioner's findings of fact, "if supported by substantial evidence," are conclusive. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 633 (3d Cir. 2010) (quotation omitted). It is a standard requiring "less than a preponderance of the evidence but more than a mere scintilla." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (quotation omitted).

In reviewing the record for substantial evidence, however, the Court must "not weigh the evidence or substitute [its own] conclusions for those of the fact finder." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (quotation omitted).

The Court's review of the legal standards applied by the ALJ is plenary. See Allen v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

**V. Discussion**

As discussed above, D.W.'s appeal raises three issues:

1. Whether the ALJ's incorrect application of section 112.05 is harmless error;

2. Whether D.W. meets the Severity Criteria in sections 112.05D and 112.05F2; and

3. Whether D.W. can satisfy the requirements of section 112.05's introductory paragraph.

For the reasons below, the Court finds that the ALJ's incorrect application of section 112.05 is harmless error, and that D.W. cannot meet the Severity Criteria in sections 112.05D and 112.05F2. Because these findings are sufficient to uphold the ALJ's decision, the Court will not address whether D.W. can satisfy the requirements of section 112.05's introductory paragraph.

**A. Harmless Error**

In Shinseki v. Sanders, the Supreme Court held that courts reviewing Court of Appeals for Veterans Claims decisions should rely on the "general case law governing application of the harmless-error standard" that applies to review of decisions in a civil case. 556 U.S. at 407. Although the Court is aware of no Third Circuit case holding that Sanders should be applied to decisions regarding applications for Social Security benefits, a number of district courts in the Third Circuit have done so. E.g., Urena v. Astrue, Civil Action No. 11-6746, 2013 WL 1737854, at *2 (D.N.J. Apr. 22, 2013); Briggs v. Astrue, Civil Action No. 12-957, 2013 WL 607833, at *11 (W.D. Pa. Feb. 19 2013); Simpson v. Astrue, Civil Action No. 10-2874, 2011 WL 1883124 at *5 (E.D. Pa. May 17, 2011) (Baylson, J.). Contra Sojourner v. Astrue, Civil

Action No. 09-5662, 2010 WL 4008558, at *3 (Robreno, J.) (stating that Sanders is limited to cases involving the Court of Appeals for Veteran Claims).[5]

In the civil context, it is axiomatic that "the mere fact that the [lower court] erred in [its] legal reasoning does not mean that [the appellate court] should reverse the result" – the "'appellate court may affirm a result reached by the [lower court] on different reasons, as long as the record supports the judgement.'" In re Oakwood Homes Corp., 449 F.3d 588, 615 n.31 (3d Cir. 2006) (quoting Brumfield v. Sanders, 232 F.3d 376, 379 n.2 (3d Cir. 2000), and citing Helvering v. Gowran, 302 U.S. 238, 245 (1937) ("In the review of judicial proceedings the rule is settled that, if the decision below is correct, it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason.")).

The Court recognizes that upholding an ALJ's decision on a ground it did not address is in apparent tension with the well-established "teaching of SEC v. Chenery Corporation, 318 U.S. 80 (1943), that '[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.'" Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) (alteration in original). However, Chenery did not create a rule that courts are confined to the legal reasoning the agency used – at least where the courts' review of legal issues is plenary, which is the case in the Social Security context. As the Third Circuit explained in RNS Services, Inc. v. Secretary of Labor, Mine Safety and Health Administration, Chenery, was concerned with courts intruding "'in situations where 'an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made.'" RNS Services,115 F.3d 182, 184 n.1 (3d Cir. 1997) (emphasis added) (quoting Chenery, 318

---

[5] Application of Sanders in the Social Security context is also supported by the more recent Supreme Court case Henderson ex rel. Henderson v. Shinseki, which endorsed the view that "the Social Security and veterans-benefit review mechanisms share significant common attributes," including that both are "unusually protective of claimants." — U.S. —, 131 S.Ct. 1197, 1204 (2011) (citations and quotations omitted).

8

U.S. at 88).[6] Thus, RNS Services upheld an agency's determination for a legal reason upon which the agency had not explicitly relied, in part, because "no factual or other determination that Congress sought to 'exclusively entrust' to the [agency was] being intruded upon by the court[]." Id.

Therefore, the Court concludes that it may uphold the ALJ's decision in this case on any legal ground that is supported by the ALJ's proper factual determinations – i.e., the ALJ's improper application of section 112.05 is harmless error so long as her findings of fact are sufficient to uphold her denial of benefits to D.W. on any legal basis.

**B.     The ALJ's Error Was Harmless.**

As noted above, D.W. argues that she meets the requirements for the listing of mental retardation in section 112.05 of Appendix 1, and, in particular, that she meets the Severity Criteria in sections 112.05D and 112.05F2. Although the ALJ incorrectly applied section 112.05, the Court finds that the ALJ's error was harmless because her findings of fact are sufficient for the Court to determine that D.W. does not satisfy either criterion.

---

[6] The Court notes that the statutory language regarding judicial review in RNS Services, 30 U.S.C. § 816(a), is materially similar to the statutory language regarding judicial review of Social Security determinations, 42 U.S.C. § 405(g):

| **Text of 30 U.S.C. § 816(a)** | **Text of 42 U.S.C. § 405(g)** |
| --- | --- |
| [T]he court . . . shall have the power to make and enter . . . a decree affirming, modifying, or setting aside, in whole or in part, the order of the Commission and enforcing the same to the extent that such order is affirmed or modified. . . . The findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. (emphasis omitted). | The court shall have power to enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . |

### 1. Section 112.05D

As noted above, section 112.05D requires "[a] <u>valid</u> verbal, performance, or full scale IQ of 60 through 70 <u>and</u> a physical or other mental impairment imposing an additional and significant limitation of function." (emphasis added). D.W. argues that she has either a valid full scale IQ score of 69 or a valid verbal IQ score of 70, and that the ALJ never questioned their validity. (Pl.'s Suppl. at 2-3.) The Court disagrees: the ALJ determined that Plaintiff's IQ scores are not valid, and this determination is supported by substantial evidence.[7] Therefore, Plaintiff cannot meet the requirements of section 112.05D.

The ALJ rejected the validity of Plaintiff's IQ scores when the ALJ determined at step two that Plaintiff suffers from the severe impairment of borderline intellectual functioning. (Tr. at 19-21.) According to the DSM-IV, borderline intellectual functioning is defined as having IQ scores between 71 and 84, and, therefore, the ALJ's finding that Plaintiff suffers from borderline intellectual functioning was a rejection of the validity of Plaintiff's IQ scores, which are below 71. See <u>Shaw v. Astrue</u>, Civil Action No. 11-139J, 2012 WL 4372521, at *5 (W.D. Pa. Sept. 24, 2012) (doctor's diagnosis of borderline intellectual functioning, and not mental retardation, "despite . . . IQ scores of 69" suggested that doctor "did not believe that plaintiff [was] mentally retarded" (citing <u>Manigault v. Astrue</u>, 2009 WL 1181253, at *9 (W.D. Pa. 2009), for the proposition that a "psychologist who diagnosed claimant with borderline intellectual functioning rather than mild mental retardation, despite IQ scores in the 61-70 range, implicitly found [those] scores to be invalid")); Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002) ("[t]he definition of [mental retardation] . . . use[d]

---

[7] Plaintiff contends that section 112.00D9 mandates "that a claimant's lowest IQ score is to be used in conjunction with" section 112.05. (Pl.'s Reply at 1.) However, 112.00D9 contains no such requirement. Rather, section 112.00D9 states "[i]n cases where more than one IQ is customarily derived from the test administered, e.g. where verbal, performance, and full scale IQs are provided . . . the lowest of these is used in conjunction with [section] 112.05." (emphasis added).

in [SSA] listings is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations. . . . all the definitions require significant deficits in intellectual functioning, as evidenced by IQ scores of approximately 70 or below" (emphasis added)).

The ALJ rejected the validity of D.W.'s IQ scores because D.W.'s 2010 psychoeducational evaluation,[8] a comprehensive assessment of her cognitive abilities that the ALJ discussed at length, indicated that D.W. showed "variability" in her performance i.e., that she performed average on some tests, but below average on others. (Tr. at 19-20.) Due to this variability, the psychoeducational evaluation team concluded that "overall cognitive scores are not believed to accurately represent [D.W.'s] abilities." (Tr. at 257.) The ALJ also specifically noted the evaluation's conclusion that D.W.'s "difficulties with motivation and inattention appear to contribute to the difficulties she has" with learning, though "emotional and behavioral issues do not appear to be the primary factors affecting her learning." (Tr. at 20, 257.)

Further supporting the ALJ's rejection of D.W.'s IQ scores is the fact that the psychoeducational evaluation contains a diagnosis of "Specific Learning Disability" – i.e., D.W. was not diagnosed as mentally retarded – as well as the ALJ's findings that:

> 1. The results of the psychoeducational evaluation were consistent with other information in the record, including reports for teachers and other evaluations of Plaintiff by her school district; and
>
> 2. Lori Hart, Ph.D., who evaluated Plaintiff in February 2009 for the Pennsylvania Bureau of Disability Determination, diagnosed Plaintiff with borderline intellectual functioning.

(Tr. 20, 256.)

---

[8] The Court notes that the ALJ made no specific mention of D.W.'s verbal IQ score of 70. In particular, the ALJ did not reference the verbal IQ score of 70 on the Kaufman Brief Intelligence Test ("KBIT") in Exhibit 9E, on which D.W. relies in her supplemental briefing. However, D.W.'s 2010 psychoeducational evaluation included a KBIT verbal IQ score of 70. (Tr. at 257-58.)

The ALJ's decision does note that the Warren E. Smith Mental Health Center ("WES") diagnosed Plaintiff with mental retardation of unspecified severity in May 2009. However, the ALJ apparently discounted the WES diagnosis because after her initial evaluation, D.W. failed to meet with WES's therapist and psychologist on a regular basis. (Tr. 21.)

Accordingly, the record contains substantial evidence to support the ALJ's finding that D.W.'s IQ scores are not valid. Cacere v. Comm'r of Soc. Sec., 189 F. App'x 59, 62-63 (3d Cir. 2006) (ALJ properly discredited IQ scores where they were "at variance with the remainder of the evidence," and the administrator of the test stated that due to "social and cultural factors," the scores may not have provided an accurate "indication of claimant's true intellectual abilities"); see also Brown v. Comm'r of Soc. Sec., Civil Action No. 08-1265, 2009 WL 3087220, at *12 (W.D. Pa. Sept. 23, 2009) ("While the ALJ may reject an IQ score, he is required to review all of the pertinent evidence of record and explain his 'conciliations or rejections,'" and the ALJ "'cannot reject IQ scores based on personal observations of the claimant and speculative inferences drawn from the record.'" (quoting Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000), and Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir.2003))). Therefore, D.W. cannot meet the requirements of section 112.05D.

### 2. Section 112.05F2.

Section 112.05F2 states that the claimant must meet the requirements of section 112.02B2a, in addition to suffering from "a physical or other mental impairment imposing an additional and significant limitation of function." As discussed in Section II.C.2., supra, the ALJ used the criteria in section112.02B2, including section 112.02B2a, to define "substantial limitation of function." (Tr. 21-22.) The ALJ also specifically found that Plaintiff met none of section112.02B2's criteria. (Id, at 22.)

12

D.W. contends that the ALJ erred in determining that she does not satisfy section 112.02B2a, because the ALJ's finding that she suffers from "a marked limitation in acquiring and using information" under 20 C.F.R. § 416.926a "is equivalent to establishing" that D.W. satisfies section 112.02B2a, (Pl.'s Suppl. at 4) which requires a "[m]arked impairment in age-appropriate cognitive/communicative function." However, D.W. neither explicates nor provides authority for her contention, which the Court rejects.

D.W.'s argument has superficial rhetorical force, because assessment of "cognitive/communicative function" and "acquiring and using information" would appear to embrace similar considerations. However, even cursory review of the SSA's guidance on the meaning of these terms leads to the inevitable conclusion that D.W.'s argument is unavailing.

According to section 112.00C of Appendix 1, "[t]he use of standardized tests is the preferred method of documentation" of the severity of a claimant's impairment. In particular, "[c]ognitive/communicative function . . . can be measured by standardized tests of intelligence . . . . A primary criterion for limited cognitive function is a valid verbal, performance, or full scale IQ of 70 or less. . . . <u>the capacity to function in the school setting is supplemental information</u>." Id. § 112.00C2a, 3, 4 (emphasis added).

20 C.F.R. § 416.926a(g)(1) describes "acquiring and using information" as consisting of learning – "explor[ing] the world through sight, sound, taste, touch, and smell. . . . acquir[ing] concepts and learn[ing] that people, things, and activities have names . . . . understand[ing] symbols . . . . Using the concepts and symbols you have acquired through play and learning experiences, you should be able to learn to read, write, do arithmetic, and understand and use new information" – and thinking – "the application or use of information you have learned. . . .

13

being able to perceive relationships, reason, and make logical choices." In SSR 09-3p, which the

ALJ references in her decision, (Tr. 24) the SSA explained that:

> Because much of a preschool or school-age child's[9] learning takes place in a school setting, preschool and school records are often a significant source of information about limitations in the domain of "Acquiring and using information." <u>Poor grades or inconsistent academic performance are among the more obvious indicators of a limitation in this domain</u> . . . .

74 Fed. Reg. 7,511, 7,513 (Feb. 17, 2009) (emphasis added). In particular, "[t]he kind, level, and frequency of special education . . . a child receives can provide helpful information about the severity of the child's impairment(s)." <u>Id.</u>

Accordingly, a claimant's poor academic performance and participation in special education programs are more weighty considerations when evaluating "acquiring and using information" than when assessing "cognitive/communicative function." Furthermore, a claimant's poor academic performance may be the result of impairments other than mental retardation, such as learning disorders – i.e., even though mental retardation would be expected to limit "acquiring and using information," a limitation in "acquiring and using information" is not necessarily evidence of mental retardation. <u>See id.</u> ("In addition to mental retardation and learning disorders, many other mental disorders can cause limitations in the domain of 'Acquiring and using information.'") This is particularly relevant in this case because the ALJ found that D.W. suffers from both a severe learning disorder and a severe reading disorder, in addition to borderline intellectual functioning. In light of the foregoing, the Court finds no error in the ALJ's determination that D.W.'s below-grade-level school performance and need for

---

[9] The ALJ evaluated D.W. under the standards for both school-age children and adolescents. (Tr. 19, 24-25.) While SSR 09-3p places particular weight on school performance for school-age children, it clearly states that school performance is relevant to adolescents as well. 74 Fed. Reg. at 7,514 (stating that "[e]xamples of typical functioning in the domain of 'Acquiring and using information'" for adolescents include "[c]ontinu[ing] to demonstrate learning in academic assignments (for example, in composition, during classroom discussion, and by school laboratory experiments)" and "[c]omprehend[ing] and express[ing] simple and complex ideas using increasingly complex language in academic and daily living situations")).

14

"specially designated instruction," in addition to her varying performance on standardized measures of cognitive ability, are sufficient to establish a "marked limitation in acquiring and using information," (Tr. 25) but insufficient to establish a marked limitation in "age-appropriate cognitive/communicative function."

## VI. Conclusion

D.W.'s Request for Review is DENIED, and her Complaint is DISMISSED with prejudice.

O:\CIVIL 12\12-4116 dw v. astrue\12cv4116.Memo Aff'ng ALJ.docx